## Case No. 16,907.

### VEAZIE v. WILLIAMS et al.

[3 Story, 611; [1] 13 Hunt, Mer. Mag. 356.]

Circuit Court, D. Maine. May Term, 1845.[2]

AUCTION SALES — FALSE BIDDING — PURCHASE BY AUCTIONEER—LACHES—RELEASE — SURETIES—COSTS.

1. Where certain mill privileges belonging to the defendants were sold at auction by H, as their agent, to the plaintiff, and, after the lapse of five years, when the property had greatly deteriorated, the plaintiff brought the present bill in equity, charging that H had, by sham bids, fraudulently enhanced the price far beyond the real value of the property; but not charging the defendants with knowledge and connivance with him, at the time of the sale.—it was *held*, that, as the false bidding by the auctioneer was unauthorized by the seller, it would not avoid the sale, although it would be a good ground of action against the auctioneer for damages; that H ought to have been made a party to the bill; and that the lapse of such a length of time was, under the circumstances, a bar to the present suit.

2. A release of all liability in the premises having been executed by the plaintiff to the auctioneer,—it was *held*, that it was a release of his principals, the defendants.

3. When, at an auction sale, all the bidders, except the purchaser, are by-bidders secretly employed by the seller, and the judgment of the purchaser is improperly influenced by their bids, the sale is a fraud, against which equity will relieve the purchaser. But when there are real bidders as well as sham bidders, and the last bid before the purchaser's is a real bid, and the judgment of the real bidders and the purchaser has not been blinded by the sham bidders, the sale is valid.

[Cited in Tufts v. Tufts, Case No. 14.233.]
[Cited in Towle v. Leavitt, 23 N. H. 371.]

4. A purchase by an auctioneer, for himself, at a sale made by him in behalf of his principal, is not void, but voidable by the principal; but third persons cannot question the sale.

5. A release of the party primarily liable is a release of all parties who are secondarily liable, at law, and especially in equity.

6. Lapse of time is a sufficient bar to a bill in equity to rescind a sale on account of fraud, where

---

[1] [Reported by William W. Story, Esq.]
[2] [Reversed in 8 How. (49 U. S.) 134.]

the plaintiff might have acquainted himself, at the time of the sale, with the facts, and especially if the circumstances be greatly changed, and the evidence be lost, or obscured.

[Cited in White v. Sutherland, 64 Ill. 188; Peabody v. Flint, 6 Allen, 57. Cited in brief in Chouteau Ins. Co. v. Floyd, 74 Mo. 289.]

7. It is the common practice not to allow costs to the prevailing party, where the district judge differs from the circuit judge.

[Cited in Goddard v. Coffin, Case No. 5.490: Burnham v. Rangeley, Id. 2,177.]
[Cited in Northern Railroad v. Concord Railroad, 50 N. H. 178.]

Bill in equity. The substance of the original bill and answer, will be found in [Case No. 16,-906]. The plaintiff [Samuel Veazie] afterwards filed a supplemental bill, which stated in substance, that after the replication of the plaintiff had been filed, and after the time for taking testimony had expired, but before publication, the counsel of the defendants [Nathaniel L. Williams and Stephen Williams] applied to the counsel of the plaintiff to admit the execution and delivery of a release by and from the plaintiff to Henry A. Head, who, in the plaintiff's original bill, was alleged to have been the agent of these defendants, and for whose acts they were sought to be charged. That his said counsel, knowing that a release had been given by the plaintiff to the said Head, as is hereinafter stated, and if available to the defendants, could be introduced by the aid of a cross bill—to avoid the delay incident thereto, consented and agreed, that the release which was not then seen by the said counsel, but which the said counsel supposed truly to express the intention of the parties. might be referred to in the hearing of the said original bill, with the same effect as if it had been put in issue by a cross bill and admitted in the answer. And the plaintiff further shows, that the said release had been delivered to the said Head prior to his exhibiting his original bill, but the same was not set forth therein, because it was between other parties, and expressing the true intent and meaning of those parties, as the plaintiff, until the original bill was set down for a hearing, supposed it did, that it did not concern the defendants and could not in any manner affect the rights and equities of the parties of the said original bill, and that it was not discovered, until after publication had passed upon the testimony in the said case, that it could or did affect the rights of the plaintiff. And that the said release is not alleged in the said original bill to have been given, neither is it relied upon or set forth in the answers of these defendants, and is put in issue as new matter by the aforesaid agreement of counsel. That the defendants now insist that the said release is a legal satisfaction of the injury, whereof the plaintiff in his original bill complains, and that the same is, in law and equity, a discharge and release, which enures for the benefit of these defendants, of all the plaintiff's claims and equities in his original bill preferred against them. That the said Head paid him no consideration for the said release, and has made him no satisfaction for the

loss and injury which he has sustained, as set forth in his original bill; and that the said release, whatever may be its terms, or the legal effect of it, as thus expressed. was not intended by the parties to it, to discharge. or in any way or manner to impair any claim, which the plaintiff had or might have against these defendants, growing out of their or the said Head's acts or doings in the premises, and that the said release, if in its terms it imports a different significance, is a fraud upon the plaintiff, and was so written by mistake. That the said release was not given in pursuance of any agreement or understanding between the plaintiff and the said Head; that he was informed by his counsel, that upon the counsel's application to the said Head for a disclosure of such facts as were within his knowledge respecting the matters set forth in the plaintiff's original bill. the said Head declined to make a disclosure upon the ground, that the plaintiff might sue him the said Head, and that he did not want a lawsuit with the plaintiff—that his counsel then assured the said Head that such was not the purpose of the plaintiff, but that he desired the proof, for the sole purpose of instituting proceedings in equity against these defendants, and that the plaintiff would give him an obligation which should release him from all suits against him on behalf of the plaintiff—that Head's liability to these defendants was at no time the subject of negotiation or conversation, and that no indemnity therefrom was at any time asked or offered or intended. And the plaintiff is advised, that the said release, according to the intent and meaning of the parties thereunto, was not intended to express an acknowledgment of satisfaction, or to intend any agreement. beyond a stipulation, that for any injuries which the plaintiff had sustained in the premises, his remedies, should not be applied against the said Head— and that the said release should be so construed and reformed. And the plaintiff further shows, that the agreement. in pursuance of which the said release was executed, and the only agreement of which it was a consummation, was made between the counsel of the plaintiff and the said Head—and that the plaintiff had no conversation with the said Head about the said agreement or release, but that his counsel, in the presence of the magistrate before whom the said Head was called to give his deposition, and in the presence of the attorneys of these defendants, requested one of the said magistrates to write a release. or some agreement, the language of which request. the plaintiff could not now state and does not recollect. and the plaintiff signed. without inquiry, the paper so executed.

The defendants in their answer to the supplemental bill admit that the said original bill, and a replication to the joint and several answer of these defendants, were filed as it is stated in the said supplemental bill. and the parties did thereupon proceed to take their proofs in the said cause. That after the time for taking the testimony in the said cause had expired, and after publication thereof, the counsel of the defendants having discovered from the answer of one Head, who was examined as a witness in the said cause, to the sixth direct interrogatory proposed to him by the said plaintiff, that some release had been executed by the said Veazie to the said Head, touching the matters in controversy in the said cause, applied to the said Head and obtained a copy of such release. Each of the respondents declares that he had not, and to the best of the knowledge, information and belief of each of them, the other of them had not, nor had either of the solicitors or counsel of these respondents in the said cause any notice or knowledge of the said release, prior to the discovery thereof, in manner aforesaid. And these respondents further answering, admit that the counsel of these respondents did apply to the counsel of the said Veazie. and did request him. in behalf of the said Veazie. to agree that the said release might be put in the said cause, and availed of therein as if the same had been put in issue by a cross bill, and the said counsel of the said Veazie replied that he would so agree, provided certain facts. which were then and there stated in writing by the said Veazie's counsel, should be agreed to, and accompany the release, and thereupon the agreement was made and signed, which was filed in the said cause, and to which these respondents crave leave to refer. The respondents admit that the said release was not put in issue by the said original bill, but these respondents are wholly ignorant of the motives or reasons which prevented the said Veazie from putting the said release in issue; and the respondents admit that the said release was not put in issue by the answer of these respondents to the said original bill, inasmuch as the respondents were ignorant of the existence of the said release, at the time when their answer was filed. The respondents admit that they do now insist, that the said release is a bar to the said original bill; and that they, and each of them, are thereby discharged from all matters of complaint in the said original bill set forth. The respondents do not know and have never been informed. otherwise than as they are by the said supplemental bill, and cannot set forth what consideration, if any, was paid by the said Head to the said Veazie for the said release, but the respondents insist and humbly submit, that no consideration was necessary to the complete and perfect validity of the said release. And as to the intentions of the said parties, and their understanding that the said release would or would not have the legal effect of discharging these respondents from the pretended claims of the said Veazie, set forth in the said original bill the respondents. answering, say that these respondents. and to the best of their knowledge and belief, the said Head also, have acted in good faith, as far as concerns the said release; that they nor either of them have or has practiced any fraud or imposition to procure the same. or to cause any terms or language to be used therein, which

the said Veazie did not intend to use; that no such fraud, or imposition, or want of good faith is charged or averred in the said supplemental bill; that the respondents are informed and believe, that the said release was signed by the said Veazie, and its language and terms agreed to by him, in the presence and under the advice of his counsel learned in the law, and were and are such as were selected by the person employed by both the said Veazie and Head to draw the said release, and the same were assented to by the said Veazie under no mistake of any fact whatsoever. And, therefore, the respondents do insist and submit to this honorable court, that it is not competent for the said Veazie to offer any proof whatever to control, or alter, or effect the legal import and effect of the said release, and they pray, that they may have the same benefit of this objection as if the same had been taken by way of a plea or demurrer to the said supplemental bill. And as to the intent of the said Veazie and Head, and as to the agreement between them, or the inducements which led thereto, or the objects designed to be effected by the said release, these respondents, not waiving their objection aforesaid, but insisting thereon, answering, say, that they have no knowledge thereof, but they have been informed by the said Head, and believe it to be true, that before the said release was given, the duly authorized attorney of the said Veazie had promised, that the said Veazie would give to the said Head a writing, holding him the said Head harmless from all claims and demands growing out of, or connected with the auction sale in the said original bill mentioned, and that the said release was subsequently given pursuant to and in execution of the said promise. But the respondents do not believe and do therefore deny, that the said Head had any understanding or expectation, that after a writing of indemnity so promised as aforesaid should be executed, he the said Head should still be liable to any action or claim for damages by the respondents, or that the said Head understood or expected, that any such construction or effect could or would be given to the said release, as would prevent the same from holding him harmless from the claims of these respondents, and as to the understanding or exceptions of the said Veazie, the respondents are not informed, except by the said supplemental bill, and cannot set forth the same. And as to so much of the said supplemental bill, as prays that the said release may be reformed or construed otherwise than according to its legal effect, the respondents insist and submit that the said supplemental bill does not show any right to have any particular change, or any change, made in the said release, and they may have the same benefit of this objection as if the same had been taken by way of plea or demurrer to the said supplemental bill.

The cause came on to be heard on the merits, and upon the evidence taken in support of the bill and answer.

Rogers & Webster, for plaintiff.
B. R. Curtis, for defendants.

Before STORY, Circuit Justice, and WARE, District Judge.

STORY, Circuit Justice. This is a suit in equity, brought under circumstances somewhat peculiar and extraordinary. In January, 1836, Head, the auctioneer, sold the mill privileges in controversy, at public auction, on account of the defendants, who were the owners thereof, for the sum of $40,000, and the purchaser at the sale was the plaintiff. Mr. Veazie, through an agent (a Mr. Foster), who bid for him at the sale. According to the condition of the sale, $4,000 were paid down at the time, and 20 per cent. soon after, when the deed of conveyance was executed to Veazie, and the remaining purchase money was secured by two notes of $14,000 each, one payable in one year, and the other in two years from the date. The first note only was paid; but the last note is unpaid, but Veazie paid interest thereon up to January, 1840. Now the object of the bill is to set aside the original sale, and to have other relief consequent thereon, upon the ground of a fraud, alleged to have been perpetrated at the sale, not by the defendants, or by their authority or connivance, but by Head, the auctioneer, in making false bids at the sale, apparently for other bidders, against the plaintiff's agent, when, in point of fact, no real bid was made by any other bidder, after the bids had reached $20,000; and that, by these means, the property was bid off to the plaintiff at a sum far exceeding its real value, and indeed more than double its real value. The bill alleges, that the fraud was not discovered by the plaintiff until since January, 1840; and the bill was filed in July, 1841. The defendants, by their answers, deny all intention and knowledge of any fraud, and deny that they ever authorized any such biddings or underbiddings by the auctioneer. And their answers are completely established, on this point, by the entire evidence in the case; and, indeed, no fraud is imputed to the defendants personally, but solely to Head as their agent. It is material, also, to state, that Head was authorized by one Ira Wadleigh to bid for him at the sale, to the amount of $20,000, and farther, if Wadleigh should by a certain signal, certify to him so to do. In truth, Wadleigh and the plaintiff seem to have been the only real bidders at the sale, after the price had advanced beyond a moderate sum. At that time, Wadleigh and Veazie were engaged in a lawsuit with each other, respecting some other mill privileges, upon which the present might seem to have some bearing; and there was obviously a serious rivalry between them, each being desirous to become the purchaser at the sale. At one time during the sale, Wadleigh stepped up to the auctioneer, and used very expressive language to him, not to bid higher on his account, if he (the auc-

tioneer) was bidding for him. Of this fact there can be no doubt; but at what stage of the biddings this was done, whether at the time when the biddings had reached but $20,-000, or when they had reached about $39,000, is a matter of controversy, and is, upon the evidence, involved in no inconsiderable doubt. The weight of the evidence, in our judgment, preponderates in favor of its being when the biddings were about $20,000, or at most not much greater. It is, however, perfectly clear, that the bidding beyond $39,000, was made by the auctioneer solely upon his own account, and was not authorized by Wadleigh.

In respect to the question, which lies at the bottom of the present suit, whether a purchaser, who purchases at a public auction, where underbidders are secretly employed to bid for the seller, by whose bids he is induced to bid higher, is bound by his purchase, the authorities are not in entire harmony. Lord Mansfield, in Bexwell v. Christie, Cowp. 395, carried the doctrine to a large extent, and held every such bidding a fraud upon the purchaser, and that the sale might be avoided therefor. Lord Kenyon in Howard v. Castle, 6 Term R. 642, affirmed the doctrine of Lord Mansfield, and asserted his reasoning to be founded "on the noblest principles of morality and justice, principles that are calculated to preserve honesty between man and man." On the other hand, Lord Loughborough, in Conolly v. Parsons, 3 Ves. 625, note, held the opposite doctrine; at least, as applicable to cases where there was no absolute, intentional fraud. He said: "I feel vast difficulty to compass the reasoning, that a person does not follow his own judgment, because other persons bid; that the judgment of one person is deluded and influenced by the bidding of others. It may weigh, if A. a skilful man, B. a cautious man, and C. a wealthy man, are in competition. But where it is publicly known, that persons are so employed to bid, it would be very foolish in any one to let himself be so influenced." He afterwards added: "It is not doubted at any sale, except where there is an express stipulation to sell without reserve, that there is somebody for the seller. The buyer goes to the sale with this knowledge, that he shall not get the article under a price the seller thinks to be a reasonable price." Lord Alvanley, in Bramley v. Alt, 3 Ves. 620, seems to have acted upon the same doctrine, where, although bidders are employed by the seller, yet there is a real bidder immediately before the purchaser. It appears to me, that there is room for some distinctions upon this subject, which, if they do not fully reconcile the cases, are, at all events, well adapted to subserve the purposes of private justice and convenience, as well as public policy. Where all the bidders at the sale, except the purchaser, are secretly employed by the seller, and yet are apparently real bidders, and the purchaser is misled thereby, and is induced to give a larger

price in consequence of their supposed honesty and exercise of judgment, there the sale ought to be held a fraud upon the purchaser, because he has been intentionally deluded by them. But where there are real bidders, as well as secret bidders for the sellers, there, if the last bid before the purchaser's bid be a real bid, and no intentional deceit has been practised by what have been sometimes called decoy ducks, to mislead or surprise the judgment or discretion either of other real bidders or of the purchaser, there seems to be a solid ground to hold that the sale is valid, and for the very reasons stated by Lord Loughborough and Lord Alvanley. It seems to me; that Sir William Grant, in Smith v. Clarke, 12 Ves. 477, 482, has pointed out the true line of distinction in his comments upon the cases; and although he did not then express any positive opinion, it is sufficiently evident what his opinion was—an opinion entitled to very great weight, for he was among the ablest judges that ever graced the courts of equity of England. He there said: "After the case of Bramley v. Alt, and what Lord Rosslyn stated to be his strong and clear opinion in Conolly v. Parsons, it would be too much for me to say, this is in itself a fraud; unless I could say, every direction by a vendor to any person to bid in his behalf, is of itself such a fraud as to vitiate every agreement that takes place at an auction, at which that direction is given. In Bexwell v. Christie, very general and broad principles are laid down by the court of king's bench; beyond any, that the case immediately before the court required. The subsequent case, Howard v. Castle, proceeded upon the ground of plain and direct fraud; Lord Kenyon stating, that it appeared at the trial to be bottomed in fraud; that it was fraud from beginning to end. There was no real bidder; and there were several bidders for the vendors. Whenever I shall be able to state the same proposition of any case, I shall come to the same conclusion. But it is clear, Lord Kenyon had not always entertained the same opinion as to the doctrine in Bexwell v. Christie; for in Twining v. Morrice [2 Brown, Ch. 326] he states, with respect to bidders being employed for the vendors, that he does not say the doctrine in Bexwell v. Christie is wrong; but every body knows that such persons are constantly employed. In Bramley v. Alt, Lord Alvanley expresses his opinion, that it is perfectly legal for a man to state a price, below which he would not permit a sale; and his lordship observes that there is no difference between setting up the lot at a given price, and employing a person to prevent a sale under that price; if that is communicated. I do not mean to state a proposition so general, as that there can be no fraud through the medium of persons employed by the vendors. Lord Rosslyn appears, in Conolly v. Parsons, to doubt, whether there can be that species of fraud: whether, in any case, the purchaser

can be said to be defrauded merely by being drawn in through eagerness of zeal and competition with others. I do not go that length; for if the person is employed, not for the defensive precaution, with a view to prevent a sale at an under-value, but to take advantage of the eagerness of bidders to screw up the price, I am not ready to say, that it is such a transaction as can be justified in a court of equity. Neither do I say, that, if several bidders are employed by the vendor, that in such a case a court of equity would compel the purchaser to carry the agreement into execution; for that must be done merely to enhance the price. It is not necessary for the defensive purpose of protection against a sale at an under-value. I leave those cases to be determined upon those grounds, whenever they may occur. It is sufficient to say, this is not a case of that description. These plaintiffs had not a fraud in contemplation; and were not in a situation that made it peculiarly incumbent upon them to take care not to permit a sale at an under-value." Mr. Chancellor Kent, in his learned Commentaries (volume 2, 5th ed., pp. 538, 539), seems to me to have arrived at the true and just and satisfactory result. "It would seem" (says he) "to be the conclusion, from the latter cases, that the employment of a bidder by the owner would or would not be a fraud, according to circumstances tending to show innocence of intention, or a fraudulent design. If he was employed bona fide to prevent a sacrifice of the property under a given price, it would be a lawful transaction, and would not vitiate the sale. But if a number of bidders were employed by the owner, to enhance the price by a pretended competition, and the bidding by them was not real and sincere, but a mere artifice in combination with the owner, to mislead the judgment and inflame the zeal of others, it would be a fraudulent and void sale. So it will be a void sale, if the purchaser prevails on the persons attending the sale to desist from bidding, by reason of suggestions by way of appeal to the sympathies of the company." See. also, Sugd. Vend. (10th Ed.) pp. 27–36, c. 1, § 2. But, be the general doctrine upon this subject, as it may, no case has fallen under my notice. in which it has been held, that the act of the auctioneer in receiving or making false bids, unknown and unauthorized by the seller, would avoid the sale. And upon principle, it is very difficult to see. why it should avoid the sale. since there is no fraud, connivance or aid given by the seller to the false bids. If the purchaser is misled by the false bids of the auctioneer to suppose them to be real, he may have an action against the auctioneer for the injury sustained thereby. But what has the innocent man to do with such a transaction—which he has, in no sense, sanctioned?

It is suggested, in the present case, that the defendants were actually informed, after the sale, that the auctioneer himself had bid one bid after the bid of $39,000, and that it was the duty of the defendants thereupon to have given notice of the fact to the plaintiff. But how is this made out? The auctioneer avowedly bid for himself, and upon his own account, and at his own risk; and the defendants were never informed that the auctioneer had been acting fraudulently at the sale, or was endeavoring to cheat the plaintiff—or that, in point of fact, the plaintiff was cheated. Nor were the defendants ever informed that the auctioneer was not fairly bidding for other bidders up to $39,000; or that any but the last bid of $500 was on his own account. It is true. that the auctioneer had no right to bid for himself at a sale made for the benefit of his principal; and if the purchase had been struck off for himself, by his being the last bid. he could not have enforced the contract against his principal; for no agent to sell. can. strictly speaking. be either a principal or an agent to buy. But then the sale is voidable only at the election of the principal, and is not utterly void. On the contrary, the principal may. if he chooses, upon notice of the fact, hold the auctioneer to his bid, as purchaser at the sale; and the auctioneer, when he purchases. purchases at his own risk and peril. But third persons have nothing to do with the matter. They can neither repudiate, nor question, nor confirm the sale. As to them, it is res inter alios acta. So that the bid by the auctioneer in this case being on his own account, and not by the authority of the defendants, it can in no measure affect them or their rights. On the other hand, there is no reason to suppose, that the plaintiff was thereby deluded into giving a price, which he deemed unreasonable. On the contrary, upon cooler examination after the excitement of the auction was over, he expressed himself well satisfied with the bargain; he was eager to complete the contract; and took extraordinary steps to intercept any attempts to defeat it. When the deed was some weeks afterwards given, he expressed no dissatisfaction, and a year afterwards he paid one of the notes without objection. So that it may be fairly said, that if he over estimated the value of the property at the time of the sale—it was not in consequence of any fraud or surprise upon his own judgment, but in consequence of his own excited feelings and sanguine schemes of future profit or collateral advantages. But, I repeat it, if he was deceived at the auction, it was the fault of the auctioneer, acting, not under the authority of the defendants. but acting for himself and at his own peril. Besides. the fact cannot be overlooked, that Head (the auctioneer) was the agent of Wadleigh and employed to bid for him. At what precise time he ceased so to bid for him, does not very distinctly appear; and so long as he continued to bid for Wadleigh, he bid for a real bidder. Now, as has been already suggested. there is some obscurity or discrepancy in the

evidence on this point; and, after such a lapse, this very circumstance ought to have some weight in a court of equity, called upon to exert itself actively in rescinding the contract of a sale. It has been very correctly stated, that, striking Head's testimony out of the case, as a witness for the plaintiff, and it would be extremely difficult to maintain the plaintiff's case. And yet Head's testimony comes to the court under circumstances of strong suspicion and doubt. He comes to proclaim his own gross fraud and abandonment of his duty in conducting the sale at auction. He comes also as a witness, released by the defendant to give him competency as a witness in the case; and he comes after several years have elapsed since the sale was made and his own agency ended.

In respect to the release given by the plaintiff to Head, in order to make him a competent witness, the case is not without its embarrassments. It appears to me, that Head, as the alleged principal perpetrator of the fraud, ought to have been made a party to the bill; he is, if not an indispensable party, at least a proper party; for, under some aspects of the case, he might have been held the party primarily liable to the plaintiff to indemnify him on account of the alleged fraud on his part; and at all events, he would have been liable even to the defendants if the sale were rescinded on account of his frauds. So that he ought to have been made a party in order to have given the defendants, the benefit of his being a party and privy to the very decree, and bound thereby. Whereas, as the case now stands, the decree, if made to rescind the sale, would not bind Head, either as a party or a privy; but he would be at full liberty to contest the whole matter anew. Now, it seems to me, that a court of equity ought not to tolerate such a mode of proceeding,—and at all events, it ought not to give its aid, under such circumstances, against an innocent principal, and thereby screen the fraudulent agent from responsibility to the party injured by the fraud. In cases of this sort, the ordinary habit of courts of equity is to require the guilty agent to be made a party. See Story, Eq. Pl. §§ 231. 232. And a fortiori such ought to be the rule where the agent is himself the party ultimately liable over for his own misconduct.

Then, again, as to the effect of the release itself. It purports, on its face, to release and discharge Head from all damages sustained by Veazie, or supposed to be sustained, and from all action or causes of action to Veazie accrued or accruing in consequence of any misfeasance, nonfeasance, or malfeasance, or any illegal management by Head, done, performed or suffered at the sale at auction of Nathaniel L. Williams and Stephen Williams's (the defendants) real estate situated in said town, &c., which was sold at auction on or near January 1, 1835, by Head, as auctioneer, thereby also releasing Head from any claim for damage by or in consequence of any of his proceedings relating to the said sale of the said property. Such is the exact substance of the release, omitting the name of Pillsbury, who was merely a formal party named therein. Now, it is said, that this is a mere personal release of Head, and in no manner discharges the defendants or was intended to discharge them from their liability for Head's misconduct. But, assuming such to have been the intention of the parties, one question is, whether, by law, it is capable of being carried into effect. No one can reasonably doubt, that the release speaks the real intentions of the parties, so far as it was to operate as a release of all claims against Head on the part of Veazie. The release was purely voluntary, and intended to make Head a competent witness for Veazie in this very cause—and, by freeing him from all liability to Veazie, to give to his testimony the full weight of a disinterested witness. But, how could this be, if, although not directly liable to Veazie, he would still be circuitously liable for all the damages occasioned by his misconduct to the defendants, if Veazie should succeed in the present suit against the defendants? To effectuate, therefore, the intentions of the parties. it would seem indispensable, that Veazie should not be able to make Head circuitously liable, through the defendants, for the very damages from which he directly released Head. But, waiving this consideration, what is the view, which, in point of law, belongs to transactions. of this nature? I take it to be perfectly clear, in point of law, that a release of the party primarily liable is a release of all others, who are only secondarily liable. A release of the principal obligor will discharge the sureties, notwithstanding the agreement between the principal and the obligor is that the sureties shall not be discharged. So a release of the maker of a note by the holder will discharge all the indorsers thereon by mere operation of law, as the maker is the primary debtor. See Story, Prom. Notes, §§ 432, 424. So the release of the principal in a trespass will discharge all other persons by whose command it has been committed. And in all these cases it becomes wholly immaterial whether the parties intended such a collateral effect or not. But in a court of equity every consideration of this sort acquires a far more conclusive authority; for a court of equity will not enforce any claim against a party only secondarily liable. in favor of a plaintiff who has chosen to discharge the party primarily liable. That would be to aid a plaintiff in voluntarily discharging the principal in guilt, and then seeking redress against the innocent party, who has been the mere victim of that guilt. A court of equity will never suffer itself to be the minister of injustice. If the plaintiff has discharged the principal in a fraud, it will not enforce the supposed rights of the plaintiff against any person, who is only secondarily liable on account of that fraud. To this effect the case of Thompson v. Harrison, 2 Brown, Ch. 164, is directly in point, if, indeed. so obvious a principle in equity requires any authority to support it.

There is another view of this matter, which,

in a court of equity, ought not to be passed over. It is this, that the gravamen of the charge in the present bill, is not that the defendants have perpetrated a fraud personally on the plaintiff; but that Head has perpetrated it, and thereby injured him. If the plaintiff chooses to waive all his rights against Head, does he not thereby, by necessary implication, waive all the consequences of that wrong against all others, who might be consequentially liable to him therefor? Can he release the substance and yet retain the incidents? Surely a court of equity cannot be called upon to redress a grievance which has been already atoned for or discharged as to the primary actor in it, by giving relief against parties collaterally liable only. Suppose Veazie had recovered a judgment and satisfaction for this very fraud against Head, would the present suit be maintainable, upon satisfaction of that judgment, against the defendants? If not, what difference is there between a release and such a judgment and satisfaction?

But passing by these and other difficulties arising in the cause, let us come to the consideration of that which in my judgment constitutes a sufficient and conclusive bar to the present suit. It is the lapse of time and change of circumstances since the original sale, which is now sought to be rescinded, was made. The sale was made in January, 1836; the suit was brought in July, 1841, five years and a half after the sale. In the mean time, the property has undergone a great change in its value, not only in the estimate then formed of it by the parties (Veazie and Wadleigh) more immediately interested in purchasing it, but also of the public at large; so that it has been stated at the bar, that it would not now bring more than one quarter part of the sum for which it was sold at the auction. Now, during the whole intermediate period, Veazie has been in possession of it, and living near it, and has had the fullest opportunity of ascertaining its real value, and of ascertaining who, besides himself, were real bidders at the sale. He could not have been ignorant, that Wadleigh was a bidder, and he had the means within his reach of ascertaining how high his bid was, and who, of any persons known to be present, were other bidders. Nay, it does not appear, that he might not have obtained from Head himself, upon diligent inquiries, whether there were any other bidders, and, if there were, their names. Why, if the purchase was so much beyond the real value of the property, did he originally complete the bargain and take the conveyance? Why, when the transaction was recent, did he not scrutinize the whole proceedings? Why did he lie by for years without complaint or observation, if there was a gross over-valuation produced by fraud, and the property was bid off for a sum which was more than double its real value at that time? This fact ought to have put him on inquiry; and the persons present at the auction were not so numerous, but that he could then have had ample means

to ascertain from them whether there were any real bids or not, beyond those of himself and Wadleigh. If he could find no other bidders upon such inquiry, the conclusion would be irresistible, that the pretended biddings were false and fraudulent. The difference between $20,000 and $40,000, in value, if the former was at that time the utmost value of the property, was a circumstance, which ought to have awakened serious, prompt, and energetic inquiry. The truth, however, seems to be, that Veazie was for a long time well satisfied with his purchase, and until the property had ceased to maintain a high marketable value; he did not, at an earlier period, deem the purchase a bad bargain, far less a fraudulent and deceptive sale. The disclosures of Head seem first to have led him to suppose an imposition to have been practised upon him, at the distance of five years after the sale. And how could his judgment or sagacity have been misled by any such imposition, if, during the intermediate time, or any considerable portion thereof, upon his own calm reflection, he had remained satisfied with the purchase? It is not for him now to say that he was misled by the auctioneer, if, in point of fact, after the hurry and excitement of the auction were over, he himself approved the purchase as one by which he was willing to abide. Besides, he now asks the defendants, who were innocent of the fraud, and who by his long silence must have been misled into a false confidence and security as to the validity of the sale, and his satisfaction therewith, now to take back the property, after a great change of circumstances, and when it must be a great sacrifice of their interest. If, while the facts were recent, Veazie had refused to complete the sale, or if, soon afterwards, he had insisted upon rescinding it, it would have been open to the defendants by suitable inquiries to have ascertained the real state of all the facts, and to have acted accordingly. But the lapse of time has not only altered the value of the property, but it has also obscured the evidence of the real nature of the transactions at the sale. What I proceed upon, therefore, is this: That after this lapse of time the court cannot put the parties in their original positions; that the defendants had no participation in the asserted fraud of Head; that Veazie sanctioned the sale by his long acquiescence as not beyond the fair value of the property; that he had as full means to know the real value of the property within a few months, or a year after the sale, as he has ever since had; that a great change of circumstances has since taken place; that Veazie was bound at an early period to elect, whether to stand by his purchase or not; and that he is not now at liberty to shift his own loss upon the defendants, or to make them responsible for the misdeeds of Head, to which they were not parties, and whom the plaintiff has been content to release from all responsibility. A court of equity should never be active in granting relief, where the circumstances are of such a na-

ture, as that it may thereby become the instrument of as much injustice as it seeks to redress.

Upon the whole my judgment is, that the bill ought to be dismissed with costs for the defendants. But the district judge is of a different opinion, and therefore, according to the common course in such cases, the bill is to be dismissed without costs to either party.

WARE, District Judge. I exceedingly regret that I cannot concur in the judgment of the circuit judge in this case. I am not insensible that it is in me assuming no inconsiderable responsibility to dissent from his opinion, after it has been deliberately made up; and I should have been willing to avoid it, if I could do so consistently with my ideas of official obligation. But having heard the case argued, and after the best consideration, that I have been able to give the subject, having come to a conclusion somewhat at variance with his, it seems due both to the parties and myself to express it. And this is intended to be done with all that deference, which is so justly due to the eminent learning and long experience of the presiding judge, and with as much brevity as is consistent with clearly expressing my views of the case. I shall also confine myself to a few points, on which the case appears to me essentially to turn. Without dwelling on the facts in proof, any farther than is necessary to make my views intelligible. I will proceed to state the grounds of my opinion.

In the first place, then, I consider the bids of Head the auctioneer, except so far as he was authorized by Wadleigh to bid for him, to be merely sham bidding, or as bidding for the owner, and that this authority was limited to about $20,000; it may be a little rising. The preponderance of the evidence I think clearly limits it to about that sum. Beyond that, there was no bidding, except by the plaintiff and Head. If, however, his authority was not limited there, but extended considerably farther, it is certain that he did continue to bid, after his authority to bid for Wadleigh was withdrawn. Taking this to be a fact, it appears to me, that the private bidding of the auctioneer for the owner was a fraud on the purchaser. When goods are offered for sale by auction, the plain and only meaning of the offer is, that they shall go to the highest bidder. There is an implied guarantee to every man who bids, that he shall have the property, if no one bids more. If the owner apprehends that his goods may be sacrificed at a price below their value, he may guard against that risk by putting them up at a minimum price; or he may direct the auctioneer not to receive a bid below a certain sum; or he may give notice that he reserves the right to make one or more bids himself. But if nothing of this kind is done, the only intelligible interpretation that can be given to the act, and it is language held out to all the world, is that he, who will give most, shall have the prop-erty. If the owner has his agent standing by and bidding for him, the real bidders are deceived, aliud simulatum, aliud actum. The purchaser is circumvented, and the price is enhanced by artifice. The bid which stands against him, he supposes to be a real offer by a competitor for the purchase; and whether it is so or not is the precise fact which he has a right to know. He raises the bid, and then finds that it was not an offer by any one intending to purchase, but that it was a mere pretence, a bid by the owner; that is, that it was no bid at all, but, when announced by the auctioneer, was a simple falsehood put into his mouth by the owner of the property or his agent, and this in a matter in which the owner of the property was bound to speak the truth, and act in good faith. This appears to me to be clearly a breach of that good faith, which ought to prevail in such transactions, and therefore a fraud.

It may not be easy to say universally what fraud is, because it is perpetually changing its forms and modes of action. It is, therefore, difficult if not impossible to confine it within the limits of any precise definition. If you attempt to embrace all its varieties of form and color in any one formula, it will immediately spring up under a new aspect and escape your definition. "Quo, teneam te, Proteu, nodo." And therefore when the prætor announced in his edict that he would relieve against fraud, he wisely forbore to say what fraud was, but simply said, "Quæ dolo malo facta esse dicentur" (Dig. 4, 3, 1). and that when the ordinary forms of law gave no specific remedy, he would interpose with his extraordinary jurisdiction. And though relief against fraud is one of the great branches of equity jurisdiction, these courts have prudently followed the example of the Roman prætor. and declined the hopeless attempt to restrain the changing Proteus within the limits of a definition, but have reserved to themselves the liberty to deal with him under whatever new form he may be brought before them. 1 Story, Eq. Jur. § 186. But the practice of owners, retaining a private agent to bid on their own goods at auction, will, it seems to me. come under any definition of fraud that has ever been attempted. For it is defined to be, "Quum aliud simulatum, et aliud agitur." We plainly have it here. for here is a pretence of a bid when there is no bid. If we take the more comprehensive definition, and describe rather than define it as, "Omnem calliditatem, fallaciam, machinationem, ad circumveniendum, fallendum, decipiendam alterum adhibitam," it certainly comes within the meaning of every one of these words. There is the craft, the fallaciousness, and the artifice, to circumvent, to delude, and deceive. Upon principle, then, it appears to me, that if the false bidding had become known to the plaintiff immediately after the sale, he might have repudiated the contract It was immediately made known to the defendants. who studiously withheld the knowledge of it from the plaintiff. They adopted the act of their agent, and sought

then, as they do now, to avail themselves of its fruits. In such a case the maxim, "Omnis rati-habitio retrotrahitur," applies with equal force in law and in morals. The act, without ceasing to be that of the mandatary, becomes that of the principal.

The view, which I have taken of the nature and obligations of the contract entered into in a sale by auction, it appears to me, may be strengthened by an analogy of some force derived from the Roman law. The contract, of frequent occurrence under that law, "De in diem addictione," bears, in some respects, a close resemblance to our sales by auction. This was a contract by which the vendor bound himself to a sale of the thing for a stipulated price, unless within a time named in the agreement he had a better offer. Dig. 18, 2, 1. In the exposition of the nature and obligations of this contract a distinction was made by the Roman jurisconsults. which may be supposed to partake somewhat of subtlety. It arose out of the terms used in the contract. If the terms were that a better offer being made the contract may be abandoned, "discedatur," the sale was declared to be pure, subject to be dissolved on the happening of the resolutory condition, and the right of property, if the condition did not occur, with all the consequences attached to this right, was considered as transferred from the time when the contract was made. But if the terms of the contract were that the sale should be accomplished, or perfected. unless a better offer was made, "perficiatur nisi," the sale was conditional, and the right of property did not pass, until the happening of the negative condition, that is, until it appeared that no better offer was made. The distinction, though, at first, it may appear refined, and to partake of subtlety, has a just foundation in the nature of the contract. It is that between what the civilians call a resolutory and a suspensive condition, and it will be perceived that important consequences, as affecting the interests of the parties, were attached to it. Dig. 18, 2, 2; Id. 18, 2, 4, § 3; Voet ad Pand. lib. 18, tit. 2, § 1; Huber. Pract. Dig. lib. 18, tit. 2, §§ 1, 2.

This contract, in its second form, bears a very close analogy to that entered into in our sales by auction. The purchaser had a right to the thing, on the payment of the price, if a better offer was not made within the time fixed by the contract. The same right. I think, a bidder at auction has, after the auctioneer has accepted his offer as a bid. To give room for the resolution of the contract. there must be found another purchaser, who makes a better offer, and this must not be a supposititious purchaser. The words of the jurisconsult are so emphatic, and coincide so exactly with the view that I have taken of this matter, that I quote them at large: "Si falsus emptor subjectus sit. eleganter scribit Sabinus, priori rem esse emptam, quia non videatur melior conditio allata esse, non existente vero emptore." Pract. Dig. lib. 18, tit. 2, §§ 6, 7. That is, if a supposititious purchaser is brought forward according to the

accurate [3] doctrine of Sabinus, the thing shall go to the first purchaser, because a better offer does not appear to have been made, there being no real purchaser. Pothier adds still further, that the second purchaser must not be a person notoriously insolvent, for if he is, he will be presumed to be supposititious. Pothier, De Vente. § 447. Now this is the precise case of a puffer at auction, the falsus emptor, the acheteur suppose, is the private bidder employed by the owner of the goods. The decision of the Roman law appears to me to apply with great exactness to modern auction sales, particularly as they are conducted in this country. And such also is the opinion of Huber, though from the peculiarities in Dutch auction sales it applies with an exactness to them. Pract. Dig. lib. 18. tit. 2, §§ 6, 7.

In referring to the Roman law as a code of written reason, I do not rely on the opinion of Cicero as applicable to this subject (De Officius. lib. 3, c. 15), though Mr. Sugden, in his Law of Vendors (chapter 1, lect. 2), seems to consider it as a civil law authority, because his book of offices was intended as a manual of pure and high moral duties, and not as a treatise on jurisprudence. He discusses and explains moral obligations and distinctions, as they may be apprehended and practised by a wise and good man, and not in the manner of a jurist, as far only as they are tangible by the law. Lib. 3, c. 17. The authorities to which I have referred, are . those, which prevailed in the forum, and governed the daily transactions of common life.

But this question of puffing at auction, does not, it is conceded, as a question of practical jurisprudence, now stand on principle alone. It is affected by previous decisions of the courts. and it is readily admitted that these decisions do not all speak the same language. In the case of Bexwell v. Christie, Cowp. 395, Lord Mansfield declared, in terms as strong as I have used, that it was a fraud; it was a fraud on the sale and the public. He put his opinion on this plain ground, that the basis of all dealings ought to be good faith, that this principle applied with peculiar stringency to public auctions, and that the owner's employing another person privately to bid for him was a breach of good faith, and therefore a fraud on the purchaser. 1 am aware that the opinion of Lord Mansfield has been criticised as being expressed in a little too strong terms, when he compared the practice to gaming, stock-jobbing. and swindling. Conolly v. Parsons, 3 Ves. 625, note. But the object of this reference was only to show that fraud did not change its nature and cease to be fraud by being practised by many persons. This opinion was concurred in by all his colleagues on the

---

[3] The word "elegans" I have translated "accurate," the primary sense of the word. and that in which it appears to be used in the Digest most frequently. and not in its secondary sense, "tasteful," in which we have transferred it into our language.

bench, and was, some years afterwards, fully confirmed by the same court, under Lord Kenyon. Howard v. Castle, 6 Term. R. 642. It has also, as I understand, received the approval of the most grave authorities in this country. 1 Story, Eq. Jur. § 293; 2 Kent, Comm. 539. It must be admitted, however, that the doctrine of Lord Mansfield has, to a certain extent, been qualified by subsequent decisions of the English courts. But these decisions seem to me to have turned in part, at least, on the act of parliament imposing a duty on sales by auction, which has been supposed to control Lord Mansfield's decision. At the same time, it may be added, that some of the most distinguished judges appear to have submitted to these limitations of the doctrine with apparent reluctance. And they seem now in England to be reduced to this, that the owner, without giving notice of his reserving a right to bid, may appoint one, but not more than one private bidder, in order to prevent a sacrifice of the property at an under price, and to counteract unfair practices among purchasers to prevent competition. So far the limitation of Lord Mansfield's doctrine appears to me to be consistent with sound legal principles, with good morals, and fair dealing, and has been received in some cases with approbation in this country. Steele v. Ellmaker, 11 Serg. & R. 86. For, in the first place, such a combination among purchasers is itself a fraud on the owner, and in some cases at least, if not in all, will render the sale void. Story, Eq. Jur. § 293. And further, if, on opening the auction, it should appear, that there were no persons present or only one, who wanted the property, and of course no fair competition, in either case, the owner ought to have the power of protecting himself in some way against a sacrifice resulting from a fraud or surprise, and it appears to me, that he may do it either by withdrawing the property offered, which perhaps would be the least objectionable mode, or by employing some person to bid it in without any violation of good faith and fair dealing. But in all cases where a puffer is employed not to prevent a sacrifice, but to inflame the price beyond the real value, it is a fraud which renders the sale void. The English courts seem to me, after some fluctuations, to have settled down to this doctrine. So it is stated by Mr. Sugden in the tenth edition of his learned treatise on the Law of Vendors (chapter 1, § 2), where he has collected and analysed the authorities down to 1839, to which I refer generally, without going over the cases. The principle, when stated in this way, may prevent some difficulties occasionally in the actual administration of the law, because it may sometimes be difficult to say when the private bidding is purely defensive, and when it is practised to take advantage of the eagerness of competitors for the purchase. In a case of doubt, the sale perhaps should be held valid, but there can be no embarrassment in a case palpably gross.

Such appears to me to be the character of this case. The value of the estate, according to the estimate of the owner, was about $15,000; the minimum price privately given to the auctioneer, was $14,500. And that also appears to have been about the estimate of the purchasers, for the bidding went up quickly to a little rising that sum, then flagged a little, but rose on real bids to about $20,000, and here I think the real competition ceased. From this point, Veazie's agent was run up by the solitary bids of Head, the auctioneer, to $40,000, nearly three times what the owner supposed to be the fair value of the property, and unquestionably all of that above the real value. In all this long race from $20,000 to $40,000, Head was either bidding as the agent of Wadleigh or bidding as a puffer; for it cannot be contended, I think, that he was bidding in good faith for himself. It is not even pretended that he wished to become a purchaser. Now Wadleigh expressly denies that he was bidding on his authority, and his testimony is corroborated by all the facts in the case. It is opposed, as far as I recollect, only by the testimony of Williams, which, as hearsay, is not evidence on this point for any other purpose than for discrediting Head. He says that, immediately after the auction, Head told him that he bid for Wadleigh up to $39,000 and then bid on his own responsibility; that is, as I infer, he bid as a puffer. So that, if this testimony is brought into the case, even this proves the fraud. It is certain then, that the price was inflamed by puffing; it is equally certain, that the purpose of the private bidding was not to prevent a sacrifice but to enhance the price. And, if I have correctly inferred the facts from the evidence, the price was carried up by absolute puffing from $18,000 to $20,000, after all real competition ceased. The act of the private bidder, approved and adopted by the defendants, was not defensive but aggressive. It was intended and operated as a fraud, and the case appears to me to be brought clearly within the modern English rule, as it is stated by Mr. Sugden on analogies of all the leading cases down to quite a recent time. I am not aware, although the decisions of our courts may not be in very exact harmony, that a different doctrine has been established in this country.

I have dwelt the longer on this point, because it appears to me to be the great point of the case. If I may be allowed to go back for an old but expressive Saxon word, the whole matter of controversy between these parties wells out of this fountain of bitter waters. If the plaintiff had discovered the fraud immediately after the sale, he might, I suppose, have repudiated the contract. Has any thing since occurred which bars this right? I was satisfied by the argument of the plaintiff's counsel that the release is not a bar to all relief. It appears to me fairly to admit the interpretation put upon it; that is, that it is a release of damages only, and not a release of the right to rescind the contract, nor of any modified relief that does not include damages. And this was undoubtedly the intention of the parties.

Then comes the question of lapse of time,

which the defendants rely upon, as a bar to relief, in their answer. It is certainly true that lapse of time is an element in equity, which often and justly has a material influence in the question of relief. Though the statute of limitation does not in its terms embrace proceedings in equity, these courts often act either in obedience or analogy to the operation of the statute at law. And in such cases, the courts have a plain rule to follow. Time will be held to be a bar to equitable relief, when it would be a bar if the title were legal. But in other cases the courts apply this element not precisely either in obedience or analogy to the statute, on their own inherent doctrine of discouraging, for the peace of society, antiquated demands. They therefore refuse to interfere, when gross laches in the prosecution of a right is imputable to a party, and he has acquiesced in a wrong for an unreasonable length of time. 2 Story, Eq. Jur. § 1520. The sale in this case was on the 1st of January, 1836, the fraud was discovered in January, 1840, and the suit was commenced in July, 1841, five years and a half after the fraud was committed, but one year and a half only after it became known to the plaintiff. Time begins to run against relief in cases of fraud only from the discovery. 2 Story, Eq. Jur. (2d Ed.) § 1520; Fonbl. Eq. bk. 1, c. 4, § 27, note q; Sherwood v. Sutton [Case No. 12,782]. It is certain, then, that the plaintiff is not barred of his remedy, either by the direct or analogical application of the statute of limitation. If lapse of time excludes him from relief, it must be in the second mode in which this principle is applied by the court, that of discouraging antiquated claims. What length of time will constitute a bar on this ground is left, it seems to me, by the authorities in no inconsiderable degree of uncertainty. In some cases it is described as a great length of time, sometimes as a considerable time, and then again as gross laches. Nothing can be more indefinite than these general expressions, nor does the nature of the subject appear to me to admit a more exact definition; for what in one case might be considered gross laches, in another might not be an unreasonable delay. The length of time that will affect a demand with the quality of staleness must depend in a great measure on the peculiar nature and particular circumstances of each particular case. And the principle will apply in various cases with very different degrees of force. The considerations which influence courts of equity in fixing this prescription of stale demands, vary in some measure according to the nature of the cases, sometimes arising out of the impolicy of disturbing titles, which have long been unquestioned, and when the estates may have passed into different hands, in confidence that the title was good; sometimes growing out of a presumption, that the matter may have been settled by the parties and the evidence of this settlement lost; and, at other times, turning on the more general ground, that time in its progress leaves all past transactions involved in more or less obscurity, and that a party by the loss of the instruments of proof, and by the death or forgetfulness of witnesses, may be deprived of the means of defending and vindicating his rights, which he might have effectually used, if he had been called to do it, when the transaction was recent. It is only in this last way, as it appears to me, that lapse of time can be urged as a bar to relief in this suit, and it is in this light that it is relied upon in the defendant's answer. Now what media of proof, either documentary or testimonial, may the defendants have lost, or be supposed to have lost, during the period that elapsed from January, 1840, to July, 1841, for this is the whole time. The prescription does not begin to run until the fraud is discovered by the plaintiff. The defendants surely cannot be heard, in the circumstances of this case, to complain of the four years that elapsed from 1836 to 1840, during the whole of which the fraud was known to them, and by them the knowledge of it studiously withheld from the plaintiff. They might well suppose, if the discovery should be made by him, that he would not rest quietly under it, and would, therefore, naturally be put upon their vigilance to preserve all the evidence necessary for their defence. In fact, lapse of time in this case is far more embarrassing to the plaintiff than to the defendants, because he must make out his claim by satisfactory proof. And if they may complain because he has kept them in the dark as to his intention, for eighteen months, it seems to me that he may, at least, parry the force of this objection, by replying that they had before, for four years, kept him in ignorance of facts most material for him to know, and which by no possibility could be learnt except from them or their agents. I have said that the defendants withheld the knowledge of the fraud from the plaintiff, and it is true undoubtedly, both in the jurisprudence of law and equity, in some cases, that "aliud est celare, aliud tacere"; but when a man is bound in good faith to speak, they are identical in morals as they ought to be in law, and such, in many cases at least, is the wholesome doctrine of equity. If I am right in principle, that the false bidding was a fraud on the purchaser, then, on a rigorous analysis of the matter, the withholding from him the knowledge of it was a continuing fraud, and thus the act celandi and tacendi becomes the same thing.

On the whole after the most careful consideration that I have been able to give to this case, it does not appear to me that the plaintiff has slept on his rights, if he has any, such an unreasonable length of time as ought to bar him of all relief. But as the whole matter of enforcing and rescinding contracts, is not, in equity, one of strict right merely, but is addressed in part, at least, to the prudence and conscience of the court, lapse of time, without being a bar to all relief, may be a reason, connected with intervening events, for giving it in a ... ified form.

If the views I have taken of the facts and of the law arising out of them be correct, it does not seem to be using too strong language. to say, that the fraud was a gross fraud, and that it was perpetrated under such circumstances as do not entitle it to any special indulgence. It was known before the sale that there was great competition for the property. Among the competitors, two men, reputed to be men of wealth, were particularly desirous of purchasing, not only from the opinion then generally entertained of the value of the property, but from the fact that they had other property in the same waterfall contiguous or near to this, the value of which might be affected by uniting with it the mill seats of the defendants. The fairest field was open for an astute auctioneer or puffer to play upon the hopes and fears and rivalships of the competitors. How successfully this was done, appears as well from the graphic description of the sale by some of the witnesses. as from the final result. This competition carried up the price fairly to about thirty-three per cent. above its supposed value, and full three hundred per cent. above what subsequent events have proved to be its real value. All this is the good fortune of the owner, to which he is fairly entitled. And with this, in my opinion. he ought to be contented.

The conclusion to which I have come, on the whole, is, that a decree allowing the sale to stand, and cutting down the price to about and perhaps a little over $20,000, will do substantial justice between the parties. It leaves to the defendants, all the advantages of a sale, under the most favorable circumstances which they can justly claim, and takes from the plaintiff only what others were willing to give.

Other points were made in the learned and able arguments of the counsel; but if I am right in the views I have taken of what I consider the main points in the case, they do not affect the conclusion to which I have arrived; and, as the opinion is already extended to a much greater length than I originally intended. I pass them by.

[Upon an appeal to the supreme court. the judgment of this court was reversed. 8 How. (49 U. S.) 134.]